UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| JULIE A. CLEMONS,<br><br>　　　　　　　　　　　Plaintiff(s),<br><br>　　v.<br><br>UNITED STATES OF AMERICA,<br><br>　　　　　　　　　　　Defendant(s). | Case No. 2:19-CV-248 JCM (EJY)<br><br>FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW |

Presently before the court is the matter of *Clemons v. United States*. This court conducted a five-day bench trial on this matter beginning December 4, 2023.

Considering the evidence adduced at trial, the court makes the following findings of fact and conclusions. Any and all findings of fact set forth herein shall constitute findings of fact even if stated as conclusions of law, and any conclusions of law set forth herein constitute conclusions of law even if stated as findings of fact.

Consistent with those findings and the previous rulings in this matter, the court hereby rules in favor of plaintiff Julie Clemons and against defendant the United States on her negligence claim, and awards damages for past medical expenses in the amount of $4,320.12, as set forth below.

**FINDINGS OF FACT**

1.　This is a personal injury action arising from a car accident on December 11, 2015 (the "accident"), involving plaintiff Julie Clemons ("plaintiff" or "Clemons") and dismissed defendant Sergeant First Class Marcus Brandt ("Brandt") of the United States Army.

**James C. Mahan**
**U.S. District Judge**

2.   Clemons alleges that the accident caused injuries to her cervical spine, lumbar spine, left shoulder, and brain. Clemons also alleges emotional distress and pain and suffering.

3.   The United States concedes $4,320.12 in damages, but Clemons did not—during trial—present sufficient testimony to establish causation to support the remaining $5,178,878.72 in damages she is seeking.

4.   Clemons did not present the court with a reasonable method of calculating damages for pain and suffering.

5.   On December 11, 2015, Clemons was driving a 2008 Nissan Altima eastbound on W. Desert Inn Road in Nevada.

6.   Clemons testified that she abruptly stopped her vehicle after the car ahead of her in the left lane came to a sudden stop.

7.   While on active duty, Brandt was driving a 2015 Ford Transit Wagon SUV behind Clemons. Upon seeing Clemons apply her brakes, Brandt applied his brakes, but the SUV struck the rear of Clemons' Nissan Altima.

8.   Clemons was 58 years old at the time of the accident.

9.   At the time of the accident, Clemons was a resident of Las Vegas, Nevada.

10.  Clemons testified that her airbags did not deploy.

11.  After the collision, Brandt—a trained combat medic—went over to Clemons to determine if she was okay.

12.  Brandt testified that at the scene, close in time to the accident, he conducted a visual examination of Clemons and did not see any evidence that Clemons sustained a concussion.

13.  Brandt testified that he did not see any bruises, scrapes, or abrasions on Clemons' head.

**James C. Mahan**
**U.S. District Judge**

14. Brandt testified that he did not recall Clemons saying she struck her head twice or telling anyone that she lost consciousness.

15. Brandt testified that he was at fault for the accident.

16. Clemons called Marvin Clemons to come to the scene of the accident.

17. Clemons refused medical attention at the accident scene.

18. On the date of the accident—December 11, 2015—Marvin Clemons drove plaintiff to the Quick Care Clinic on Maryland Parkway, where she was seen by Dr. Tarquino.

19. At the Quick Care Clinic, Clemons denied having back pain.

20. At the Quick Care Clinic, Clemons reported only a headache, neck pain, and left shoulder pain.

21. At the Quick Care Clinic, a physical examination of Clemons' lumbar spine revealed that it was normal.

22. Dr. Tarquino did not diagnose Clemons with a concussion.

23. Dr. Tarquino noted that there were no visible lesions on Clemons' head.

24. Dr. Tarquino prescribed only one month of physical therapy and a muscle relaxant.

25. Dr. Tarquino did not refer Clemons to an orthopedist, a neurologist, or a pain management specialist.

26. Defense expert Dr. Rubenstein, a board-certified neurologist, testified that the Quick Care records demonstrate that Clemons was alert and oriented during her examination without any record of confusion, disorientation, posttraumatic amnesia, or repetitive questioning.

27. Dr. Rubenstein testified that no head trauma was memorialized on the date of the accident.

28. Clemons did not seek additional medical testing for approximately a month following the accident.

29. Clemons quit her job one month after the accident.

30. Clemons testified that she did return to work after the accident and was able to drive on her own.

31. The record demonstrates that, before the accident, Clemons had complained of—and been treated for—lower back pain.

32. The record demonstrates that, before the accident, Clemons had bilateral shoulder pathologies.

33. Clemons had received a total arthroplasty in her left shoulder in March of 2011 and an arthroscopic procedure in her right shoulder in August of 2011.

Alleged Neurological Injuries

34. On January 14, 2016, Clemons saw a neurologist complaining of severe, radiating headaches; confusion; lack of concentration; balance issues; extreme fatigue; and dizziness. The neurologist, Dr. Chopra, ordered a variety of diagnostic tests and suggested physical therapy and a follow-up with an orthopedic surgeon.

35. Clemons received a brain MRI on January 29, 2016.

36. Defense expert Dr. Rubenstein testified that the January 29, 2016, brain MRI of Clemons showed no structural abnormalities and no evidence of traumatic brain injury ("TBI").

37. On May 17, 2016, Clemons saw a different neurologist, Dr. Paul Janda, complaining of shoulder, neck, and back pain radiating to her arms and legs as well as multiple cognitive deficits. Dr. Janda ordered a variety of diagnostic tests along with continued physical

and balance therapy. There is no record that Clemons relayed that she had struck her head twice or that she lost consciousness during the accident.

38. On May 24, 2016, Clemons received an electroencephalogram ("EEG").

39. The EEG report on May 24, 2016, was normal, which ruled out any seizure activity or the presence of an intracranial lesion.

40. On May 31, 2016, Clemons received another brain MRI.

41. Defense expert Dr. Rubenstein testified that the May 31, 2016, brain MRI showed no structural abnormalities or evidence of TBI.

42. Clemons saw Dr. Janda again on June 14, 2016. Dr. Janda noted that her brain MRI and EEG were both normal. However, Dr. Janda prescribed pain medications, steroids, and an additional 3 Tesla Brain MRI, as her subjective complaints continued, despite a previous normal brain MRI.

43. Dr. Rubenstein testified that greater occipital neuralgia is an unlikely cause of Clemons' headaches.

44. On July 18, 2016, Clemons received a 3 Tesla Brain MRI. Dr. Rubenstein testified that the 3 Tesla Brain MRI showed no structural abnormalities or evidence of TBI.

45. Clemons claimed that residual dizziness caused her to fall on an escalator at Harry Reid International Airport in mid-December 2016. No doctor had diagnosed Clemons with—or treated her for—vertigo between the date of the accident and this fall.

46. There is no objective medical evidence that Clemons' alleged fall in December 2016 is causally related to the accident.

47. On January 31, 2017, Clemons was diagnosed with a "functional gait disorder." Functional gait disorders are a subset of functional movement disorders, which are clinical

syndromes defined by the occurrence of abnormal, involuntary movements that are incongruent with a known neurologic cause. A functional gait disorder is not a diagnosis related to a musculoskeletal or anatomic injury and may also be referred to as a psychogenic movement disorder. A functional gait disorder is unrelated to any organic cause.

48. After moving briefly to Wisconsin, Clemons continued to have normal neurologic examinations, conducted by Dr. Bubolz at Aurora Bay Care Medical Center in Green Bay, Wisconsin.

49. Later, Clemons resumed treatment with Dr. Paul Janda, who provided Botox injections for newly diagnosed migraine headaches.

50. Dr. Rubenstein testified that the Botox treatment Clemons has been receiving is not (and will never be) causally related to the accident.

51. Clemons received yet another brain MRI on May 27, 2021, by Dr. Bubolz, and the records indicate that her brain was normal.

52. While Clemons claims moderate to severe memory deficits, the record indicates that she has always been able to provide a very detailed account of the accident.

53. Clemons' delay in alleging confusion, lack of concentration, and dizziness is inconsistent with a concussion.

54. Clemons' brain imaging does not show any structural brain injury.

55. Dr. Rubenstein testified that Clemons had no neurologic findings consistent with vestibular, cerebellar, or posterior column spinal cord pathology.

56. There is no objective medical evidence that Clemons suffered a traumatic brain injury due to the accident.

57. Dr. Rubenstein testified that Clemons' neurologic examinations have been consistently normal over the years despite the intensity of *subjective* complaints.

58. Clemons suffers from a somatic symptom disorder, preexisting anxiety disorder, and major depressive disorder, which are the actual causes of any neurological symptoms she may be experiencing.

Alleged Left-Shoulder Injuries

59. Clemons was treated on a lien at Don Nobis Physical Therapy, starting December 23, 2015.

60. Clemons' first visit with an orthopedist was on January 26, 2016, at Advanced Orthopedics & Sports Medicine in Las Vegas.  X-rays of her left shoulder revealed no fracture or dislocation and her prosthesis from a prior total shoulder arthroplasty was well fixed.

61. X-rays taken of Clemons' left shoulder in early February 2016 demonstrated that there was superior migration of the humeral head consistent with questionable advancing rotator cuff disease and that there was evidence of a prior acromioplasty with a thinned acromion.

62. A February 17, 2016, CT of Clemons' left shoulder demonstrated mottling and lucency of the bony structures of the glenoid which may be due to prior surgery and, further, that there are linear lines in the glenoid which may be due to prior surgery, prominent vessels, or recent trauma.

63. On March 28, 2016, Dr. Yee performed a left shoulder arthroscopy on Clemons.

64. Defense expert Dr. Murphy, an orthopedic surgeon specializing in the treatment of the shoulder, testified that this March 18, 2016, left shoulder arthroscopy was not medically necessary and not causally related to the accident.

65. As of July 13, 2016, Dr. Yee noted that Clemons' left shoulder was doing great and that she had no pain. The left shoulder showed no signs of infection. Dr. Yee diagnosed a well-fixed prosthesis and there was no recommended follow-up for Clemons.

66. Clemons reinjured her left shoulder on March 16, 2017, while reaching above her head at her home, yet X-rays were negative for any acute pathology. She was seen that same day by Derek Harmelink, where the primary concern was a biceps tendinitis tear.

67. On March 16, 2017, X-rays of Clemons' left shoulder document what appeared to be an oversized humeral head with lucencies in the glenoid. Dr. Murphy testified that no gross loosening was seen in this X-ray.

68. On March 28, 2017, a left shoulder ultrasound was performed on Clemons, which noted a complete tear of the bicep tendon and a partial thickness tear of the supraspinatus, as well as some degenerative tearing.

69. On May 15, 2017, Clemons had an office visit with Dr. Gil Freeman for an evaluation for left shoulder pain and a diagnosis of a failed total shoulder arthroplasty. Defense expert Dr. Murphy testified that this failed shoulder arthroplasty relates to Clemon's prior shoulder surgery and is causally unrelated to the accident.

70. On May 23, 2017, Clemons saw Dr. Scott A. Anderson from the University of Wisconsin for a second opinion regarding a left shoulder arthroscopy. Dr. Anderson notes that she had a long history of issues with her left shoulder.

71. On January 17, 2018, X-rays of Clemons' left shoulder showed joint space narrowing with sclerotic changes and osteophyte formation consistent with degenerative joint disease.

72. On March 1, 2018, a CT scan of Clemons' left upper extremity was conducted at Simon Med radiology. Defense expert Dr. Murphy testified that at this point, the rotator cuff of the left shoulder had a full tear, demonstrating the progression of the disease.

73. Dr. Yee referred Clemons to Dr. Nick Liu for a revision surgery to her left shoulder arthroplasty, which was done on August 22, 2018, at the Southern Hills Medical Center.

74. Dr. Murphy testified that Dr. Liu's operative notes indicate that the rotator cuff issues were degenerative.

75. Dr. Murphy testified that the August 22, 2018, revision left shoulder arthroplasty was not causally related to the accident. Dr. Murphy testified that the accident did not necessitate revision shoulder arthroplasty.

76. Dr. Murphy testified that the post-accident treatment that Clemons received on her left shoulder represented a natural progression of rotator cuff disease that predated the accident, caused by an oversized shoulder implant placed during her shoulder surgery in 2011, approximately four years before the car accident.

77. Dr. Murphy testified and explained that an oversized implant is known to place undue stress on the supraspinatus tendon and cause eventual tearing over time. Dr. Murphy explained that as the rotator cuff fails, the humeral head prosthesis will migrate superiorly and cause asymmetric wear on the glenoid component resulting in loosening of the glenoid component over time, which ultimately will lead to failure of the shoulder arthroplasty.

78. Dr. Murphy testified and explained that his support for this opinion was that Dr. Yee noted only a 10 percent bursal-sided fraying of the rotator cuff at the time of surgery in March 2016. At the time of the surgery, Dr. Yee also noted no instability of the humeral head, no full-thickness rotator cuff tear, and no instability of the glenoid component.

James C. Mahan
U.S. District Judge

- 9 -

79. By December 17, 2018, Clemons had no complaints of pain in the left shoulder and was doing well. From this point forward, no further records mention her left shoulder causing pain or limiting daily activities.

80. Clemons had preexisting bilateral shoulder pathology before the accident.

81. Clemons' shoulder surgery on August 22, 2018, is not related to the accident.

82. Dr. Murphy testified that the accident did not lead to Clemons' need for the revision shoulder arthroplasty procedure.

83. Dr. Murphy testified that Clemons will not need any future treatment on her left shoulder.

84. If Clemons were to undergo any treatment or surgery on her left shoulder in the future, it would not be causally related to the December 11, 2015, car accident.

Alleged Spine Injuries

85. A CT scan of Clemons' cervical spine on February 17, 2016, showed no fracture.

86. Defense expert Dr. Bjerke, an orthopedic surgeon with a specialty in the spine, testified and explained that there was no evidence of acute or traumatically induced injuries on the February 17, 2016, CT scan of the cervical spine.

87. On May 31, 2016, Clemons received an MRI of her cervical spine.

88. Dr. Bjerke opined that there is no evidence of any acute or traumatically induced injuries on the May 31, 2016, cervical spine MRI. The MRI showed no fractures or gross soft tissue injury and only some very mild degeneration at the C6/7 level with a broad disc bulge at C6/7. Dr. Bjerke explained that these findings are age-appropriate and expected in an adult patient of Clemons' age.

89. On May 31, 2016, Clemons received an MRI of her lumbar spine.

James C. Mahan
U.S. District Judge

- 10 -

90. The MRI showed mild endplate changes at the L5/S1 disc space and mild degenerative changes. There is no significant spinal stenosis (crowding or pressure on the spinal nerves). There are no signs of significant trauma, disc herniation, or significant soft tissue injury.

91. Dr. Bjerke explained that these findings are age-appropriate and to be expected in an adult patient of Clemons' age.

92. Dr. Bjerke testified that the "mild endplate changes at the L5/S1 disc space" were not caused by the accident.

93. Dr. Bjerke opined that there is no evidence of any acute or traumatically induced injuries on the May 31, 2016, lumbar spine MRI.

94. During Clemons' visit with Dr. Janda on June 14, 2016, he ordered electromyography ("EMG") for her complaints of neck and lower back pain.

95. On July 11, 2016, Clemons' nerve conduction studies were all within normal limits. The only abnormality found on the EMG was electrodiagnostic evidence of a right L5-S1 radiculopathy. There was no electrodiagnostic evidence of plexopathy, radiculopathy, or inflammatory myopathy affecting all four extremities.

96. Dr. Bjerke explained that there was no objective medical evidence connecting Clemons' right L5-S1 radiculopathy to the accident.

97. On October 25, 2016, Dr. Janda referred Clemons for a neurosurgical opinion.

98. On December 7, 2016, Clemons saw neurosurgeon Dr. Mark B. Kabins, who diagnosed her with neck and lower back strain with occipital neuralgia.

99. X-rays taken of Clemons' spine on December 7, 2016, did not demonstrate any instability or evidence of fracture.

**James C. Mahan**
**U.S. District Judge**

100. Dr. Bjerke testified that the December 7, 2016, cervical spine x-rays did not show any acute or traumatically induced injuries to Clemons's back that were causally related to the accident.

101. Clemons received X-rays of her lumbar spine on February 7, 2017. Dr. Bjerke testified that the X-rays did not show any acute or traumatically induced injuries that were causally related to the accident.

102. From March 14, 2017, to June 22, 2017, Clemons underwent epidural steroid injections (ESIs) from Dr. Mariam El Baghdadi. Dr. Bjerke testified that none of these injections were medically necessary as a result of the accident.

103. Clemons later began pain management treatment with Dr. Katherine Travnicek who provided steroid injections to her back.

104. Dr. Bjerke testified that none of the epidurals and injections provided by Dr. Travnicek were medically necessary or causally related to the accident.

105. X-rays of the Clemons' lumbar spine were taken by Dr. Grondel on January 16, 2019. Dr. Bjerke testified that the X-rays did not show any acute or traumatically induced injuries that were causally related to the accident.

106. Dr. Grondel also conducted a general neurological evaluation of Clemons on January 16, 2019. Dr. Grondel noted that Clemons demonstrated good coordination and could walk without assistance.

107. Clemons received yet another MRI of her lumbar spine on January 28, 2019. Dr. Bjerke testified that the MRI did not show any acute or traumatically induced injuries that were causally related to the accident.

108. Clemons received epidurals on February 28, 2019, from Dr. Travnicek, and Dr. Bjerke testified that they were not medically necessary or causally related to the accident.

109. Dr. Bjerke testified that there was no objective medical evidence that an L4/5 radiculopathy was caused by the accident.

110. Clemons' cervical MRIs were normal for her age, showing only normal degenerative changes.

111. Clemons' lumbar MRIs were normal for her age, showing only normal degenerative changes.

112. There is no objective medical evidence that any of the orthopedic treatment Clemons received after the accident, both shoulder and spine, was causally related to the accident.

113. All of Clemons' radiology results were normal for a patient of her age.

114. None of Clemons' treating physicians ever recommended a two-level lumbar fusion surgery.

115. Dr. Cash is one of Clemons' expert witnesses and is a board-certified orthopedic surgeon.

116. Dr. Bjerke testified that Dr. Cash's proposed two-level lumbar surgery is not medically necessary or reasonable based on Clemons' medical records, documentation, and imaging in this case. Dr. Bjerke testified there is no medical justification for lumbar spine surgery.

117. Dr. Bjerke testified that Clemons will not need any future orthopedic treatment (images, repeat testing, evaluations, consultations) for her back that will be causally related to the accident. Dr. Bjerke testified that he specifically disagreed with plaintiff's expert Dr. BiFulco's recommendations.

118. The record demonstrates that there is no radiographic or clinical evidence of any spinal disease that would cause Clemons to experience weakness, loss of balance, vertigo, or instability.

119. There is no scoliosis or spinal deformity noted in any of the imaging.

120. From December 11, 2015, to the present, there is no evidence that Clemons sustained a structural lumbar or cervical spine injury.

Alleged Emotional Distress

121. On July 16, 2016, Dr. Janda ordered neuropsychological testing.

122. Defense expert Dr. Rubenstein testified that there was no indication in the records that Clemons ever underwent forensic neuropsychological testing.

123. Clemons received Cognitive Behavioral Psychotherapy and Biofeedback Therapy from Dr. Mortillaro from September 2016 to November 2016, at which time Clemons was discharged from his care due to significant improvement. Dr. Mortillaro stated there were no residual accident-related psychological issues that would need further treatment.

124. Clemons had many preexisting mental health and medical problems that were not related to the accident, and which were not exacerbated by the accident.

125. Clemons has not met her burden of proof to demonstrate emotional distress or pain and suffering.

Future Damages

126. The objective medical evidence does not support any of the treatment proposals offered by Dr. Cash.

127. The objective medical evidence does not support any of the life care plan proposals offered by plaintiff's life care planning expert, Dr. BiFulco.

**James C. Mahan**
**U.S. District Judge**

128. Because there is no evidence that Clemons suffered an acute, traumatic spine injury in the accident, any future treatment for her cervical or lumbar spine would not be causally related to the accident.

129. At the time Dr. BiFulco wrote his report, he had not spoken with any of Clemons' treating physicians or any other experts.

130. Dr. Cash testified that he never examined nor treated Clemons.

131. Dr. Cash testified that he never reviewed any diagnostic images of Clemons.

132. Clemons has not sought any vocational assistance to help her return to the workforce.

133. Dr. Jesko, the defense's life care planning expert, testified that Dr. BiFulco failed to conduct a forensic interview with Dr. Cash,

134. Dr. Jesko testified that after her forensic interviews with Dr. Rubenstein, Dr. Murphy, and Dr. Bjerke, she found no objective evidence of ongoing residual neurological or orthopedic issues associated with the accident. She found that there was no objective evidence to support future medical care.

135. Dr. Jesko testified that Dr. BiFulco failed to utilize the standards of practice for forensic life care planning and, therefore, his opinions are not reliable.

136. Dr. Jesko testified that Dr. BiFulco's estimates regarding Clemons' future medical needs are speculative and unsupported.

Damages

137. The government concedes that Clemons suffered the following injuries:

1) a cervical spine strain;

2) a lumbar spine strain;

James C. Mahan
U.S. District Judge

- 15 -

        3) a left shoulder contusion;

        4) neck pain.

138.  The government concedes that the following medical visits (including exams, treatments, and diagnostic studies) were reasonable and necessary because of the accident:

        1) the December 11, 2015, Quick Care Clinic visit;

        2) the referral to Don Nobis for Physical Therapy (for one month only);

        3) and medication prescribed by Dr. Taquino.

139.  All other treatments (including exams and diagnostic studies) undergone by Clemons were not reasonable, necessary, or causally related to the accident.

140.  Correspondingly, the court finds that no future medical treatment and expenses are reasonably certain to be incurred as a result of the accident.

141.  Reasonable and necessary past medical expenses due to the accident total $4,320.12.

142.  The court does not award economic loss, loss of earnings, or diminished earning capacity.

143.  The court does not award noneconomic damages for past pain and suffering.

144.  The court does not award noneconomic damages for future pain and suffering.

145.  The court does not award noneconomic damages for emotional distress.

146.  The court finds that Clemons was not comparatively negligent in the accident.

**CONCLUSIONS OF LAW**

1.  Under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(1), 1402(b), 2401(b), 2402, 2671-2680 ("FTCA"), this court has subject matter jurisdiction over the plaintiff's negligence claim against the United States.

**James C. Mahan**
**U.S. District Judge**

2. Subject to certain exceptions and conditions, the FTCA waives the United States' sovereign immunity such that the United States may be held liable for the negligence of its employees in the same manner and to the same extent as a private individual under like circumstances, according to the law of the state where the act or omission occurred. *See Louie v. United States*, 776 F.2d 819, 824 (9th Cir. 1985); 28 U.S.C. §§ 1346(b)(1), 2674.

3. The extent of the United States' liability under the FTCA is determined by the substantive law of the state where the act or omission occurred, but federal law governs procedural issues. *Liebsack v. United States*, 731 F.3d 850, 855 (9th Cir. 2013); *Delta Savings Bank v. United States*, 265 F.3d 1017, 1025 (9th Cir. 2001).

4. Damages awarded pursuant to the FTCA are determined by the laws of the state where the act or omission occurred. *Molzof v. United States*, 502 U.S. 301, 305 (1992).

5. Nevada law applies to Clemons' negligence claim.

6. A plaintiff must establish four elements to succeed on a negligence claim: (1) a duty of care, (2) a breach of that duty, (3) legal causation, and (4) damages. *Turner v. Mandalay Sport Entm't*, 180 P.3d 1172, 1175 (Nev. 2008).

7. "Legal causation" requires a finding that the defendant was both the cause in fact and the proximate cause of the plaintiff's claimed injuries. *Bower v. Harrah's Laughlin, Inc.*, 215 P.3d 709, 724 (Nev. 2009) (modified on other grounds). "Proximate cause is any cause which in natural and continuance sequence, unbroken by any efficient intervening cause, produces the injury complained of and without which the result would not have occurred." *Taylor v. Silva*, 615 P.2d 970, 971 (Nev. 1980).

8. The United States is liable for the car accident that occurred on December 11, 2015, and concedes $4,320.12 in damages.

**James C. Mahan**
**U.S. District Judge**

9. The plaintiff has not met her burden of establishing causation and damages for the remaining $5,178,878.72 in damages she is seeking. As a matter of law, a temporal sequence alone is insufficient to establish causation---this is the *post hoc* fallacy. *See Howard v. City of Coos Bay*, 871 F.3d 1032, 1046 (9th Cir. 2017) ("[W]e are mindful of avoiding 'the logical fallacy of *post hoc, ergo propter hoc*.'"). The existence of one condition following the existence of another, without more, is insufficient to prove that the first condition caused the second.

10. "[T]he burden of establishing damages lies on the injured party." *Central Bit Supply v. Waldrop Drilling & Pump*, 717 P.2d 35, 37 (Nev. 1986) (citing *Dinwiddie Constr. Co. v. Campbell*, 406 P.2d 294 (Nev. 1965).

11. If the factfinder determines that the plaintiff has not established causation, he or she may conclude that the defendant is liable for the accident yet award no damages to the plaintiff. *See Quintero v. McDonald*, 14 P.3d 522, 523–24 (Nev. 2000); *Fox v. Cusick*, 533 P.2d 466, 468 (Nev. 1975) ("[I]t is within the province of the jury to decide that an accident occurred without compensable injury."). This is particularly true when there are "confirmed lapses in medical treatment following the accident," the plaintiff has preexisting injuries, and the plaintiff fails to offer conclusive evidence of the "reasonableness of the expenses or the necessity of treatment." *Quintero*, 14 P.3d at 523-24.

12. The factfinder is not "bound to assign any particular probative value to any evidence presented." *Id.* Accordingly, even when the parties have stipulated to the admission of medical bills, the factfinder may infer—based on other evidence presented at trial—that the plaintiff's injuries were not legally caused by the subject accident. *See id.*

**James C. Mahan**
**U.S. District Judge**

13. It is up to the factfinder to determine the credibility of witnesses and resolve evidentiary conflicts between competing expert testimony. *E.g., SEC v. Todd*, 642 F.3d 1207, at 1217 (9th Cir. 2011).

14. "An award for pain and suffering compensates the injured person for the physical discomfort and the emotional response to the sensation of pain caused by the injury itself. Separate damages are given for mental anguish where the evidence shows, for example, that the injured person suffered shock, fright, emotional upset, and/or humiliation as the result of the defendant's negligence." *Banks ex rel. Banks v. Sunrise Hosp.*, 836, 102 P.3d 52, 61–62 (Nev. 2004) (citation omitted).

15. A plaintiff may recover damages for "reasonable past and future medical expenses and for past and future physical and mental pain, suffering, anguish, and disability" only if it is supported by observable and objective evidence. *Paul v. Imperial Palace, Inc.*, 908 P.2d 226, 228 (Nev. 1995).

16. To recover for medical expenses and treatment, a plaintiff must prove that the expenses and treatments were "reasonable and necessary" as a result of the defendant's tortious conduct. *Wilson v. Biomat USA, Inc.*, No.: 2:10-cv-1657-GMN-RJJ, 2011 WL 5239236, at *3 (D. Nev. Oct. 31, 2011) (citing *Hall v. SSF, Inc.*, 930 P.2d 94, 97 (Nev. 1996)). This is because a negligent defendant is, of course, not automatically liable for every future expense incurred by a plaintiff, but only for those that are the "natural and probable consequence" of the defendant's tortious conduct. *Id.* (citing *Hall*, 930 P.2d at 97).

17. If there is no medical expert testimony stated to a reasonable degree of medical certainty, then there is nothing on which the trier of fact can rely. *See Neal-Lomax v. Las Vegas*

James C. Mahan
U.S. District Judge

*Metro. Police Dept.*, 574 F. Supp. 2d 1193, 1198 (D. Nev. 2008) (citing *Morsicato v. Sav-On Drug Stores, Inc.,* 111 P.3d 1112, 1116) (Nev. 2005)).

18. Prejudgment interest and punitive damages are not allowed under the FTCA. 28 USC § 2674; *Carlson v. Green*, 446 U.S. 14, 29 n.1 (1980).

Accordingly,

IT IS HEREBY ORDERED, ADJUDGED, and DECREED that, consistent with these findings and conclusions, judgment shall be entered in favor of the plaintiff on her negligence claim in the amount of $4,320.12.

IT IS FURTHER ORDERED that the United States shall prepare and file a proposed judgment consistent with the foregoing findings and conclusions within 10 days of this order.

DATED December 28, 2023.

_____
UNITED STATES DISTRICT JUDGE

**James C. Mahan**
**U.S. District Judge**